UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ALURA STEVENS,

    Plaintiff,

      v.

ST. JOSEPH HOSPITAL,
ST. JOSEPH HEALTHCARE FOUNDATION,
and COVENANT HEALTH, INC.

    Defendants.

Civil Action No.

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Alura Stevens ("Plaintiff" or "Ms. Stevens"), by and through

undersigned counsel, and complains against the Defendants, St. Joseph Hospital, St. Joseph

Healthcare Foundation, and Covenant Health, Inc. (collectively "Defendants" or "St. Joseph

Hospital"), as follows:

JURISDICTION AND PARTIES

1.    This action arises under the Maine Whistleblowers' Protection Act ("MWPA"), 26

M.R.S. §§831 *et seq.*, as enforced through the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§

4551 *et seq.*; and the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 – 3733.

2.    Ms. Stevens is a United States citizen and, during the period of her employment

with Respondents, resided in the Town of Orrington, County of Penobscot, State of Maine.

3.    Ms. Stevens currently resides in Boise, Idaho where she is working as a travel

nurse because she has been unable to secure gainful employment in Maine.

4.    St. Joseph Hospital is an acute care hospital.

1

5.      The St. Joseph Healthcare Foundation is a medical network offering patients primary care providers, specialists, laboratory services, medical care, surgical care, orthopedic care, cardiopulmonary care, physical and occupational therapy, and an emergency department.

6.      St. Joseph Hospital is a member of the St. Joseph Healthcare Foundation. St. Joseph Hospital is owned and operated by St. Joseph Healthcare Foundation.

7.      Covenant Health is a Catholic healthcare organization comprised of acute care hospitals, skilled nursing facilities, assisted living facilities, independent living facilities, and physician practices and clinics.

8.      St. Joseph Healthcare Foundation, and consequentially St. Joseph Hospital, are managed and operated by Covenant Health.

9.      St. Joseph Hospital, St. Joseph Healthcare Foundation, and Covenant Health are an integrated enterprise with common ownership, common management, interrelated operations, and integrated human resources.

10.     St. Joseph Hospital is a Maine corporation which operates in Bangor, Maine.

11.     St. Joseph Healthcare Foundation is a Maine corporation which operates in Bangor, Maine.

12.     Covenant Health, Inc. is a Massachusetts corporation with a principal place of business in Massachusetts and operations in Massachusetts, New Hampshire, Rhode Island, Vermont, Pennsylvania and Maine.

13.     St. Joseph Hospital employs approximately 800 employees.

14.     The amount in controversy in this matter exceeds $75,000.

15.     This Court has subject matter jurisdiction over Ms. Stevens' federal and state claims pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

16.     On or about October 9, 2024, Ms. Stevens filed a timely Complaint/Charge of Discrimination against Defendants alleging unlawful retaliation and whistleblower retaliation with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC").

17.     On or about March 19, 2026, the MHRC issued Notices of Right to Sue with respect to Ms. Stevens' state law claims.

18.     Ms. Stevens has exhausted her administrative remedies with respect to all claims set forth in this Complaint requiring administrative exhaustion.

JURY TRIAL REQUESTED

19.     Ms. Stevens requests a trial by jury for all claims and issues for which a jury is permitted.

FACTUAL ALLEGATIONS

**A. Background**

20.     Jessica DeGrasse is the Director of Peri-Operative Services.

21.     Susan Best is a charge nurse in Ms. Stevens' department and was Ms. Stevens' direct supervisor.

22.     Natalie Brown is the Director of Human Resources.

23.     Ms. Stevens was hired by St. Joseph on October 31, 2022, and worked there until her termination on August 8, 2024.

24.     Most recently, Ms. Stevens worked at St. Joseph as an Operating Room Registered Nurse.

25.     Ms. Stevens also worked at St. Joseph's in various capacities intermittently from 2016 to 2019.

26.     Ms. Stevens performed her job in a satisfactory manner during the eight years of her employment.

27.     By the end of her employment, Ms. Stevens earned $37.24 per hour, plus a bonus. She also received shift differentials, as well as on-call pay and call-in pay.

**B.  Positive Performance Reviews**

28.     On February 16, 2023, Ms. Stevens' supervisor wrote in a performance review: "[Alura's trainer] said that the feedback she is getting has been really good. Excellent job Alura! Neither Alura nor Susan had any concerns to express."

29.     On March 16, 2023, Ms. Stevens' supervisor wrote in a performance review: "Alura handed over several completed competencies that Shari signed her off of. Great job! Keep up the great work, Alura!"

30.     On April 6, 2023, Ms. Stevens' supervisor wrote in a performance review: "[Alura's trainer] has no concerns. This is awesome feedback. Great job Alura!"

31.     On May 11, 2023, Ms. Stevens' supervisor wrote in a performance review: "[Alura] is right on track with her training and is doing very well. Great job Alura!"

32.     On February 1, 2024, Ms. Stevens had her annual review. She met or exceeded expectations in every category. Her manager wrote "Alura is organized and prioritizes tasks. Patient advocacy is one of the most important roles as a circulating nurse and it is evident that she always puts her patients first. She is attentive and committed to her patients' needs and safety. Alura is competent and engaged."

**C.  Protected Reports**

4

33.    The staff in Ms. Stevens' department at St. Joseph had a monthly meeting on the first Monday of each month. During this meeting, employees were encouraged to raise their hands and address comments, questions, or concerns.

34.    Ms. Stevens was very vocal at these meetings when she had concerns.

35.    Ms. Stevens made multiple reports during the months of May and June 2024 about patient safety and the hospital's standard of care.

36.    She reported that surgeons proceeded with cases that the hospital was not equipped to handle, that the IT security was weak and violated HIPPA guidelines, and that employees were charting under other employees' names.

37.    Ms. Stevens made multiple complaints about St. Joseph allowing nurses and other employees to chart under each other's names and computer log-ins, most recently during the June 2024 department meeting (the first Monday in June).

38.    Ms. Stevens explained that she was concerned about the practice of other employees charting under her name.

39.    On or around May 10, 2024, Ms. Stevens reported an incident during a surgery where a scrub nurse handed plain dressing sponges to a surgeon, who placed them in the patient's incision. This is against St. Joseph policy since dressing sponges are not counted and are not permitted in the surgical field due to a risk of them being left inside of the patient's incision once it is closed. This is a major violation of patient safety and surgical protocol.

40.    Around May 24, 2024, Ms. Stevens reported an issue regarding a patient with a latex allergy. The charting software malfunctioned and a patient's latex allergy was not highlighted as it should have been. This caused a delay in the patient's treatment when employees had to break down the entire room and sterilize it before treating the patient.

41.    On July 1, 2024, during the monthly staff meeting, Ms. Stevens raised concerns about employees being placed in dangerous situations with limited resources.

42.    Specifically, Ms. Stevens reported an incident that occurred in June 2024. She was in an operating room with a 15-year-old patient who was intubated and under anesthesia. In another operating room, a patient coded during intubation. The anesthesiologist assigned to Ms. Stevens' patient left the room to check on the other patient (who was not her patient).

43.    After fifteen minutes, the surgeon assigned to Ms. Stevens' patient asked her to find someone to cover their patient's anesthesia, since at that time there was no one in the room who was qualified to care for an anesthetized patient. Neither Ms. Stevens nor the surgeon are certified in airway and advanced life support.

44.    The patient was left without qualified care for 20 minutes before the anesthesiologist returned. It was extremely dangerous for the anesthesiologist to leave the patient in that manner. Protocol requires the anesthesiologist to continue monitoring her own patient.

45.    The anesthesiologist was asked by several employees in the other operating room to return to her own room. There were already several anesthesia staff members in the room who were supervising or floating and were considered backup for situations such as this.

46.    Ms. Stevens made this report in good faith. She knew that patient abandonment is a violation of the law. Ms. Stevens' patient was a minor and her life was put at risk. Further, the professional license of every employee in the room was at risk due to the anesthesiologist's actions.

47.    When Ms. Stevens alerted Jessica DeGrasse, Director of Peri-Operative Services, to the fact that the anesthesiologist had abandoned her patient, as Ms. Stevens had been instructed to do by the surgeon about 15 minutes after the anesthesiologist left the room, Ms.

DeGrasse was shocked and told Ms. Stevens that she could not be alone with an intubated patient.

48.    Prior to entering the coding patient's room, Ms. DeGrasse made a comment "of course this happened the one morning I decided to come in late so my husband and I could have coffee together" then asked various staff members if they were available to cover in Ms. Stevens' patient's room.

49.    Only then did Ms. DeGrasse enter the coding patient's room and attempt to instruct the anesthesiologist to return to her own patient.

50.    At the time, the anesthesiologist was attempting to place an arterial line with ultrasound and did not respond to Ms. DeGrasse, so Ms. DeGrasse entered Ms. Stevens' patient's room to inform Ms. Stevens that they were working on finding someone to cover for the anesthesiologist.

51.    After Ms. Stevens reported this incident in the monthly meeting, her supervisor, Susan Best, quickly stated "it's been dealt with". She seemed irritated and did not permit Ms. Stevens to ask questions.

52.    When Ms. Stevens asked how the issue was being addressed to ensure it did not happen again, Ms. Best refused to discuss the situation.

53.    Both Ms. Stevens' initial report regarding the absent anesthesiologist and her reported concern about how the incident was being addressed/not addressed were reports protected under the MWPA.

54.    Ms. Best exhibited animus towards Ms. Stevens following these two reports by refusing to respond to or discuss the reported concerns.

7

55.     Ms. Stevens also reported a case in which a surgeon proceeded with an operation even though the patient had a cardiac history and was in the emergency room with an issue that St. Joseph did not typically treat. St. Joseph was also operating with a "skeleton crew" at the time.

56.     Ms. Stevens believed that the patient should have been transferred to the hospital across town that deals with critical traumas.

57.     Ms. Stevens, the certified registered nursing anesthetist, and the certified surgical technologist assigned to the case all made complaints about the operation. The certified surgical technologist even refused to continue with the case and was replaced by another employee.

58.     Ms. Stevens made each of these reports to shed light on practices and conditions that she believed violated the law, deviated from the standard of patient care, and/or endangered Defendants' patients.

59.     Ms. Stevens made each of these reports so that the practices and conditions in question would be addressed, eliminated, and so these practices and conditions would not occur in the future.  In this way, her reports were protected by the MWPA and FCA.

### D. Issues Reported by Ms. Stevens Reflect Failure by Defendants to Comply with Conditions for Participation in Medicare and/or MaineCare

60.     Ms. Stevens reported that surgeons proceeded with cases the hospital was not equipped to handle, a practice that violated Medicare hospital Conditions of Participation requiring surgical services to be organized and provided in accordance with acceptable standards of practice and appropriate to the scope of services offered, and requiring an effective hospital-wide quality assessment and performance improvement program, and also risked noncompliance with MaineCare participation conditions requiring adherence to applicable Medicaid laws and

the MaineCare Benefits Manual. 42 C.F.R. §§ 482.51, 482.21; MaineCare Provider Agreement (Conditions of Participation).

61.    Ms. Stevens reported that the hospital's weak IT security practices violated HIPAA and Medicare participation requirements by failing to implement required administrative and technical safeguards for electronic protected health information and by failing to maintain medical record systems that protect the security and integrity of record entries, thereby risking MaineCare noncompliance as well. 45 C.F.R. §§ 164.308, 164.312; 45 C.F.R. §§ 164.306; 42 C.F.R. § 482.24; MaineCare Provider Agreement (Conditions of Participation).

62.    Ms. Stevens reported that employees routinely charted under other employees' names and shared log-ins, including charting under her name, which violated Medicare Conditions of Participation requiring the hospital to maintain secure, accurate, and integrity-protected medical records and violated HIPAA privacy and security requirements governing permissible access to protected health information and the implementation of workforce compliance controls, and likewise implicated MaineCare participation requirements. 42 C.F.R. § 482.24; 45 C.F.R. §§ 164.530, 164.308, 164.312, 164.306; MaineCare Provider Agreement (Conditions of Participation).

63.    Ms. Stevens reported that during surgery a scrub nurse provided plain dressing sponges that were placed in a patient's incision despite not being counted, a practice that may have violated Medicare Conditions of Participation requiring surgical services to be provided in accordance with acceptable standards of practice and requiring hospital-wide quality assessment and performance improvement to prevent and correct patient safety violations. 42 C.F.R. §§ 482.51, 482.21; 10-144 C.M.R. ch. 114.

64.     Ms. Stevens reported that an anesthesiologist left an intubated minor under anesthesia without qualified anesthesia coverage for approximately twenty minutes, a practice that may have violated Medicare Conditions of Participation governing organization and responsibility for anesthesia services and requiring surgical and nursing services to operate according to acceptable standards and adequate staffing, and that required corrective action under the hospital's quality improvement obligations. 42 C.F.R. §§ 482.52, 482.51, 482.23, 482.21.

65.     Ms. Stevens reported that hospital leadership refused to explain or ensure corrective measures following the anesthesia abandonment incident, conduct that may have violated Medicare Conditions of Participation requiring an ongoing, hospital-wide quality assessment and performance improvement program and implicating governing body oversight responsibilities for hospital operations and quality of care. 42 C.F.R. §§ 482.21, 482.12.

66.     Ms. Stevens reported that a surgeon proceeded with a high-risk operation on a patient with a cardiac history while the hospital was operating with a "skeleton crew" and despite the need for transfer to a trauma-capable facility, conduct that may have violated Medicare Conditions of Participation for surgical, nursing, and emergency services and potentially implicated EMTALA stabilization and appropriate transfer requirements. 42 C.F.R. §§ 482.51, 482.23, 482.55; 42 U.S.C. § 1395dd; 42 C.F.R. § 489.24.

67.     Ms. Stevens reported that an EMT student disclosed patient-specific surgical details in a group chat, a HIPAA breach that may have violated Medicare participation requirements regarding confidentiality and security of medical records and implicated MaineCare participation conditions requiring compliance with applicable Medicaid laws and

10

standards. 45 C.F.R. §§ 164.502, 164.530, 164.308, 164.306; 42 C.F.R. § 482.24; MaineCare Provider Agreement (Conditions of Participation).

68. Defendants continued to bill and receive payment through the Medicare and MaineCare programs for the particular cases at issue in Ms. Stevens' reports and more generally even though Defendants may have failed to comply with conditions for participation in these programs.

69. Ms. Stevens engaged in protected activity under the FCA when she reported concerns about conditions and practices that could reasonably lead to an FCA action; in other words, investigations, inquiries, testimonies or other activities that concern the employers' knowing submission of false or fraudulent claims for payment to the government and the use of false records material to a fraudulent claim.

### E. Retaliation

70. On July 26, 2024, there was a wrong site surgery at St. Joseph.

71. Ms. Stevens was not involved in the wrong site surgery, but on August 6, 2024, she was informed by Ms. DeGrasse that this patient's chart had been audited and that on July 29, 2024 from 08:27 to 08:29 there had been activity within the patient's chart under Ms. Stevens' login.

72. Ms. Stevens was asked by Ms. DeGrasse why she had been in this patient's chart, and Ms. Stevens informed Ms. DeGrasse that she had not accessed the patient's chart and would have no reason to access the chart.

73. On July 29, 2024, when Ms. Stevens was accused of accessing the patient's chart, she was involved in a complex surgery that required many employees to be in and out of the operating room.

11

74. Ms. Stevens and others in her department at St. Joseph had been directed by her charge nurses, Laurie True and Susan Best, to remain signed in to the computer until they were leaving for the day. She was also given this instruction by the nurses training her during her orientation.

75. The stated reason for the direction to employees to stay signed in was that the department did not have single badge swipe sign-in capabilities, meaning that it took a long time to sign out and sign back in every time one left the room or went on break.

76. Ms. Stevens' supervisors, including Laurie True and Susan Best, regularly instructed her to remain logged in to the computer. Ms. Stevens was verbally reprimanded and rebuked if she did not comply.

77. Employees were directed to remain signed in to save time during handoffs and to minimize the possibility of being locked out of a computer during a case, even though this was against St. Joseph's policy.

78. Because of the department's computer policy, many staff members and supervisors would chart under Ms. Stevens' name.

79. It was not uncommon to find employees who did not have computer access using the nurse's computer. For example, surgeons, anesthesia workers, and scrubs would use the nurse's computer.

80. Operating room computers are not labelled to specific rooms and are on wheels. Employees regularly move computers from room to room as needed.

81. Ms. Stevens did not access the patient's chart on July 29.

82. Ms. Stevens believes that another employee accessed the patient's chart under her name, since she was logged into the computer.

12

83. Ms. Stevens knows that she was on her break during the time that the patient's chart had been accessed because she has a text message chain with her husband during that time.

84. Ms. Stevens would not have been able to use her phone if she was in the operating room because using a personal device during a procedure was against St. Joseph's policies and because the case she was working on was very busy and high risk, so she wouldn't have had time to be on her phone even if it was in the operating room with her.

85. Because the July 29 surgery was so complex, the timing for breaks and relief did not align with the scheduled breaks set out in the system. Rather, staff members were coming and going when it made sense to do so and the times of the breaks were not memorialized in real time because staff were focused on the surgery.

86. As a result, for the July 29th surgery employees entered their breaks in after the fact, without the exact time being correct.

87. It is very common among St. Joseph circulating nurses to estimate charting times.

88. When surgeries are very busy and complex, multiple things are happening simultaneously. It is not always possible to chart every single action at the exact moment in which it occurs.

89. Break times are usually estimated, and circulating nurses would go back at a later point in the case to enter in their best estimates.

90. In this specific instance, the relief circulator, Aaron, did not chart any times or comings and goings of people in the room.

91. Ms. Stevens and the other circulating nurse had to go back and enter the information after the fact.

92. Ms. Stevens' own break time was estimated for this case.

13

93.     Ms. Stevens informed Ms. DeGrasse that she did not access the patient's chart and that she had been on her break when the chart was accessed. The claim that Ms. Stevens had illegally accessed this patient's chart and violated HIPAA was false and contradicted by the evidence.

94.     On July 30, 2024, Ms. Stevens reported a HIPPA violation against the same patient whose chart she had been accused of accessing.

95.     Ms. Stevens made her report to her supervisor, Susan Best.

96.     When Ms. Stevens made this report, she was unaware of the false allegation that she had accessed the patient's chart during the July 29th surgery.

97.     Ms. Stevens reported that an EMT Student who had been present in the operating room sent messages about the patient, detailing the surgery and the situation, to a groupchat of people. The groupchat included someone who Ms. Stevens knew personally and who sent Ms. Stevens a screenshot of this message.

98.     When Ms. Stevens reported this to her assistant manager, Susan Best, she rolled her eyes and told Ms. Stevens that she had already spoken to the student, then didn't speak to Ms. Stevens for the rest of the day.

99.     On August 7, 2024, Ms. Stevens was verbally reprimanded by her charge nurse for logging out of her computer while she was on her break.

100.    On August 8, 2024, Ms. DeGrasse and Ms. Brown informed Ms. Stevens that because she was not visible on cameras anywhere outside of the department during the time that the HIPAA violation had occurred on July 29th, she would need to take responsibility for the HIPPA violation.

101.    On August 8, 2024, Ms. Stevens was terminated.

102.    The stated reason for her termination was that she was in breach of HIPPA because she had accessed a patient's medical record when there was no business need to do so.

103.    Ms. Stevens knows of other employees who have violated HIPPA and only received warnings.

104.    A CRNA named AA[1] was stuck by a patient's needle. St. Joseph tested the patient for diseases, but before AA received the test results, she logged into the patient's chart to check their test results herself. AA was reprimanded for this HIPPA violation but not terminated.

105.    After Ms. Stevens' termination, Defendants discovered that she had accessed medical records of another patient who was not under her care.

106.    Ms. Stevens had been asked to look at this patient's chart by the patient's surgeon because of an event with the patient post-operation.

107.    Staff often must revisit previous patients' records if chart correction is required or if there is a call case (when an on-call employee is required to come in to assist with an operation), as was the situation in this matter.

108.    Ms. Stevens did nothing wrong in accessing this patient's chart. Further, the fact that Respondents sought justification for Ms. Stevens' termination after the fact is evidence of pretext and retaliatory animus.

### F. Subordinate Bias

109.    Ms. Stevens' managers, Ms. DeGrasse and Ms. Best, played a role in Ms. Stevens' termination.

110.    Further, they withheld exculpatory information that would have resulted in Ms. Stevens' exoneration.

---

[1] This Complaint uses pseudonyms for non-management employees to protect their privacy.

111. Ms. DeGrasse was very involved in the investigation of the alleged HIPAA violation and worked closely with the Compliance and HR departments.

112. Ms. DeGrasse was also Ms. Stevens' primary point of communication throughout the investigation.

113. The only action that Ms. DeGrasse took to determine whether or not Ms. Stevens had been responsible for the HIPAA violation was to look at the recorded break times during the July 29, 2024 surgery.

114. Ms. DeGrasse informed Compliance and HR, via email, that she had concerns about Ms. Stevens and thought that she should be terminated.

115. Ms. DeGrasse understood that employees in Ms. Stevens' department were directed to keep their computers unlocked and chart under others' names.

116. Ms. DeGrasse was aware that, although the computer system reflected that Ms. Stevens had viewed the patient's chart, it could have been any number of employees operating under Ms. Stevens' credentials.

117. Ms. DeGrasse ran the monthly department meetings where many employees, including Ms. Stevens, expressed concern about this practice. Neither Ms. DeGrasse nor Ms. Best ever addressed employees' concerns.

118. Ms. Best even charted under Ms. Stevens' names multiple times while Ms. Stevens was on break, despite Ms. Stevens informing Ms. Best that this made her uncomfortable.

119. Additionally, Ms. Best was familiar with the practice of circulating nurses recording surgical break times as an estimate.

120. When Ms. Stevens first began working as a circulating nurse, she asked Ms. Best what she should do if she didn't remember exact break times. Ms. Best informed Ms. Stevens that a lot of people estimate break times and told Ms. Stevens to "just do the best she could".

121. Ms. Best informed Ms. Stevens that the main importance was just to demonstrate that she had taken a break and left the room for a certain period of time, but that it was not necessary to record the exact timing.

122. Neither Ms. DeGrasse nor Ms. Best notified Compliance and HR about these practices. Had they been forthcoming with this information, Ms. Stevens would not have been terminated.

123. It is apparent that Ms. Stevens' supervisors, and particularly Ms. DeGrasse, wished for Ms. Stevens to be terminated so that she could no longer complain about and shed light upon unsafe and illegal practices and that they provided misleading information and withheld exonerating information to effectuate Ms. Stevens' termination.

124. Although Ms. Best and Ms. Degrasse were not the final decision makers in Ms. Stevens' termination, the misleading information provided and the information withheld from the final decision makers proximately caused Ms. Stevens' termination.

**G. Conclusion**

125. Probative timing evidences a causal connection between Ms. Stevens' protected reports and her termination.

126. Evidence that Ms. Stevens was treated differently and worse than similarly situated coworkers who did not engage in protected activity evidences a causal connection between her protected reports and her termination.

127.    The fact that Defendants have provided false reasons for Ms. Stevens' termination is strong evidence that Defendants have dissembled the facts to cover up a retaliatory purpose. This evidences a causal connection between Ms. Stevens' protected reports and her termination.

128.    Ms. Stevens was terminated in retaliation for reporting illegal and unsafe practices. Her termination violated the Maine Whistleblower's Protection Act and the anti-retaliation provision of the Federal False Claims Act.

129.    Ms. Stevens' termination has caused stress, anxiety, financial hardship, and loss of enjoyment of life.

130.    By way of example, Ms. Stevens is working in Boise, Idaho to be gainfully employed. Her termination from employment has put her in a position where she needs to live away from her home and community to make a living.

131.    Defendants by and through their managers knew or should have known that terminating Ms. Stevens and taking actions to effectuate her termination in retaliation for making protected reports violated her state and federal rights.

<u>COUNT I: MWPA/MHRA Retaliation</u>

132.    Paragraphs 1-131 are incorporated by reference.

133.    Defendants' conduct violated the MWPA by retaliating against Plaintiff because she engaged in protected activity under the MWPA, as enforced through the MHRA.

134.    Plaintiff made numerous reports to shed light on practices and conditions that she believed violated the law, deviated from the standard of patient care, and/or endangered St. Joseph's patients.

135.    Plaintiff was motivated to make these reports so that the practices in question would be addressed, eliminated, and so these practices would not occur in the future. In this way, her reports were protected by the MWPA.

136.    Plaintiff's reports were made in "good faith" and were reasonable.

137.    Plaintiff was terminated because of her protected reports, and her protected reports were factors that made a difference in the decision to terminate her employment.

COUNT II – FCA Retaliation

138.    Paragraphs 1 – 137 are incorporated by reference.

139.    The anti-retaliation provisions of the FCA make it unlawful to discharge, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of lawful acts done by the employee in an effort to stop a violation of the FCA.

140.    Plaintiff made multiple reports to her employer regarding practices which may have violated Medicare and/or MaineCare conditions for participation.

141.    Ms. Stevens engaged in protected activity under the FCA when she reported concerns about conditions and practices that could reasonably lead to an FCA action; in other words, investigations, inquiries, testimonies or other activities that concern the employers' knowing submission of false or fraudulent claims for payment to the government and the use of false records material to a fraudulent claim.

142.    Defendants violated the anti-retaliation provision of the FCA when they terminated Ms. Stevens in retaliation for these actions.

PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A.      Declare the conduct engaged in by Defendants to be in violation of her rights;

B.      Enjoin Defendants, their agents, successors, employees, and those acting in concert with it from continuing to violate her rights;

C.      Order Defendants to reinstate Plaintiff or award front pay to Plaintiff;

D.      Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendants' retaliation;

E.      Award equitable-relief for back pay, benefits and prejudgment interest;

F.      Award compensatory damages in an amount to be determined at trial;

G.      Award punitive damages in an amount to be determined at trial;

H.      Award nominal damages;

I.      Award attorneys' fees, including legal expenses, and costs;

J.      Award prejudgment interest;

K.      Require Defendants to mail a letter to all employees notifying them of the verdict against them and stating that Defendants will not tolerate discrimination in the future;

L.      Require that Defendants post a notice in all of their workplaces of the verdict and a copy of the Court's order for injunctive relief;

M.      Require that Defendants train all management level employees on the protections afforded by the MWPA and 42 U.S.C. Sec. 1983;

N.      Require that Defendants place a document in Plaintiff's personnel file which explains that Defendants unlawfully terminated her because of unlawful discrimination and retaliation; and

O.      Grant to Plaintiff such other and further relief as may be just and proper.

20

21

Dated: March 31, 2026

/s/ Chad T. Hansen
Chad T. Hansen
Attorney for the Plaintiff

EMPLOYEE RIGHTS GROUP
92 Exchange Street 2nd floor
Portland, Maine 04101
Tel. (207) 874-0905
Fax (207) 874-0343
Chad@EmployeeRightsLaw.Attorney